[Cite as *State v. Ragland*, 2011-Ohio-2245.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
|  | : | Julie A. Edwards, P.J. |
|  | : | William B. Hoffman, J. |
| Plaintiff-Appellee | : | Patricia A. Delaney, J. |
|  | : |  |
| -vs- | : | Case No. 2010CA00023 |
|  | : |  |
|  | : |  |
| MAKI RAGLAND | : | O P I N I O N |
| Defendant-Appellant | | |

CHARACTER OF PROCEEDING:        Criminal Appeal from Stark County
Court of Common Pleas Case No.
2009-CR-1028(B)

JUDGMENT:        Affirmed

DATE OF JUDGMENT ENTRY:        May 9, 2011

APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

JOHN D. FERRERO                    WAYNE E. GRAHAM, JR.
Prosecuting Attorney                    Suite 300 Renaissance Centre
Stark County, Ohio                    4580 Stephen Circle, N.W.
                                        Canton, Ohio  44718

BY: RONALD MARK CALDWELL
Assistant Prosecuting Attorney
Appellate Section
110 Central Plaza, South – Suite 510
Canton, Ohio  44702-1413

*Edwards, P.J.*

{¶1} Defendant-appellant, Maki Ragland, appeals his conviction and sentence from the Stark County Court of Common Pleas on one count of murder with a firearm specification, one count of aggravated burglary with a firearm specification, four counts of aggravated robbery with firearm specifications, one count of felonious assault with a firearm specification, and one count of having weapons while under disability. Plaintiff-appellee is the State of Ohio.

<u>STATEMENT OF THE FACTS AND CASE</u>

{¶2} On August 27, 2009, the Stark County Grand Jury indicted appellant on one count of murder (Count One) in violation of R.C. 2903.02(B), one count of aggravated burglary (Count Two) in violation of R.C. 2911.11 (A)(1) or (A)(2), a felony of the first degree, four counts of aggravated robbery (Counts Three, Four, Five and Six) in violation of R.C. 2911.001(A)(1) or (A)(3), felonies of the first degree, one count of felonious assault (Count Seven) in violation of R.C. 2903.11(A)(1) or (A)(2), a felony of the second degree, and one count of having weapons while under disability (Count Eight) in violation of R.C. 2923.13(A)(2) or (A)(3), felonies of the third degree. All of the counts, with the exception of the having weapons while under disability count, were accompanied by firearm specifications. At his arraignment on August 28, 2009, appellant entered a plea of not guilty to the charges.

{¶3} Subsequently, a jury trial commenced on December 14, 2009, on all counts except Count Eight (having weapons while under disability), which was severed. The following testimony was adduced at trial.

{¶4}    In July of 2009, Daniel Sankey was living at a house on 14th Street, N.E. in the City of Canton along with his daughter, Danielle, and her daughter, Harmoney, who was two years old. On July 2, 2009, Daniel Sankey, Danielle Sankey, Harmoney Sankey, Marlo Morales, who is Daniel Sankey's girlfriend, and Jason Nelson, who is Danielle's friend, were at the address. Daniel Sankey was in the process of changing his tracheotomy and was about to play a game of dominos when someone came to the door. Daniel Sankey testified that he was expecting a friend to come by with a video disc recorder. According to Daniel Sankey, when he asked who was at the door, "someone hollered out Nardo, which is Ms. Morales' son." Transcript at 166. Marlo Morales told appellant that it could not be her son because he had just called her and told her he was leaving town and going back to Akron.

{¶5}    When Morales opened the door, she let the two black males at the door, who were wearing hoodies, into the house under the belief that Daniel Sankey was waiting for them.   While one of the men remained in the front of the house, the other approached Daniel Sankey, who was sitting at a table. Sankey testified that he did not pay much attention to the man because he thought it was the person who was bringing the video to him. The following testimony was adduced when Sankey was asked what the man said to him:

{¶6}    "A. Well, first he said what's up.  I said hey, what's up, still not looking at him.  And he said something like - - trying to be precise word for word. What's up.  He was like well, you know what this is.  I said what is this, you know.  And then he proceeded to say something else and I thought he was playing a game, joking around

because I thought it was the person I was looking for, and he said I think you need to get up.

{¶7} "Q. Now, before you said that did you see anything on him?

{¶8} "A. When he said I think you need to get up he nudged me with a gun.

{¶9} "Q. What did the gun look like?

{¶10} "A. It was long, had the round barrel, had the holes in it and dark in color, but it still looked like it could be a toy to me. And then I said how long are you going to carry this game, play this game? I'm still thinking he is playing around not serious because he wasn't real aggressive with what his demand was. So I am not thinking it's a robbery." Transcript at 170-171.

{¶11} After the man hit Sankey in the head with the gun, Sankey jumped up and the man stepped back and shot Sankey.

{¶12} At the time Daniel Sankey was shot, Harmoney, his granddaughter, had just walked past him heading towards a bedroom. Daniel Sankey testified that after the man shot him, the two men went towards the front door as if they were leaving. Sankey then stepped into the bedroom, closed the door and told Marla Morales to grab Harmoney so that they could leave. At the time, Sankey did not see anything wrong with Harmoney, who had asked Morales to pick her up. After fleeing his house via a side door off of his bedroom, Sankey, who did not realize that he had been shot in the leg and who was bleeding heavily from a head wound, went to a neighbor's house. The neighbor called 911.

{¶13} At trial, Daniel Sankey testified that when he went outside of his neighbor's house, he saw his daughter, Danielle, walking around hysterically and saw

Marlo Morales in a bloody shirt. Sankey then learned that Harmoney had been hit and was being taken to the hospital. Harmoney later died. Sankey received stitches for his head injury and was treated for the gunshot wound to his leg.

{¶14}  At trial Danielle Sankey testified she was sitting on the couch watching a movie with Jason Nelson in the living room when there was a knock on the door. According to Danielle, the person at the door said their name was Nardo.  The following testimony was adduced when Danielle Sankey was asked whether she heard anything going on in the kitchen or the dining room area:

{¶15}  "A. I heard my dad say what do you want, what are you here for.  And the guy said you know what I am here for.  Quit playing around.  My dad is like I don't know what you are talking about.  And then I heard some scuffles and I heard a gunshot.  I heard Marlo yell heard the baby.

{¶16}  "Q. Back you up for a second.  After you heard a gunshot, that would be the first one, did anything - - did you see anyone come into the living room?

{¶17}  "A. After I heard the gunshot a few minutes later he was coming out.  The first guy had left after the shooting had started.  And then I heard another gunshot and the shell from the second gunshot gun came into the living room.  So I seen the shell to the second gunshot.  And then he stopped in the living room before he left out and asked us if we had anything, if we had anything to give him.  I think he was talking mostly to Jason.  I didn't see his face or anything, then he left."   Transcript at 236-237. The man left after the two had nothing to give him.

{¶18}  Marlo Morales, Daniel Sankey's girlfriend, testified that on June 16, 2009, she had celebrated her daughter Regina's birthday at Daniel Sankey's house. At the

time, Regina was dating Isaiah Thomas who brought a man known as "Beans" with him to the party. Morales testified that, on July 2, 2009, her son Renaldo had been at Daniel Sankey's house but had left. After he left, they were getting ready to play dominos and Morales was smoking marijuana when someone came to the door. Morales, who testified that she did not hear the person at the door identify himself, opened the door after Daniel Sankey told her that "Nardo" was at the door. Morales testified that she opened the door and then walked away and never looked to see whether Nardo was at the door. She indicated that she could not say how many people came into the house because she was not paying attention and was going to turn music on in a bedroom. Morales later became concerned when she noticed that the two men had their hoodies on and that one had a gun. Morales testified that, at some point, she recognized the man who did not have a gun and who was standing by the door. The following testimony was adduced when she was asked how she recognized him:

{¶19} "A. The gentleman that was wearing the peanut butter coat told him to go to the bedroom and he came into the bedroom. When he stepped into the bedroom there is a landing there as you are coming in. He wasn't paying attention to it and he slipped and that mirror that sits right there by the door, his hoody slid off and at that point I seen his face and knew who he was.

{¶20} "Q. Who did you know him to be?

{¶21} "A. Beans.

{¶22} "Q. When you noticed it was Beans did that cause you to do anything?

{¶23} "A. Made me more nervous." Transcript at 305.

{¶24} Morales also testified that when she picked up Harmoney while in the bedroom, she did not notice anything wrong with her. She testified that while she was in the bedroom, the man who had fired the gun approached her and asked her where Daniel Sankey had gone. The same man subsequently asked her "where the shit at." Transcript at 309. Morales then told the man that she did not know what he was talking about. According to Morales, the man took items off of a table and took $27.00 out of her pocket. The man then left the house.

{¶25} Shortly after the incident, Morales went to the police station where she gave a statement to the police and also picked "Beans" aka William Ferguson out of a photo array. She also picked appellant out of another array and identified him as the shooter. Daniel Sankey, Danielle Sankey and Jason Nelson were unable to pick anyone out of the photo arrays.

{¶26} William Ferguson testified at appellant's trial. Ferguson testified that he had pleaded guilty to complicity to aggravated robbery, complicity to aggravated assault, felonious assault and complicity to aggravated burglary and to three firearm specifications and that he had agreed to testify against appellant in exchange for a nine year sentence. Ferguson testified that he had met Marlo Morales at Daniel Sankey's house approximately four or five months before the incident in this case either to purchase marijuana or because he was with someone who was purchasing marijuana. He testified that at such time, Regina Morales' birthday was celebrated.

{¶27} Ferguson testified that, on July 2, 2009, he met Isaiah Thomas earlier in the day. The two were near Aultman Hospital when Ferguson's car overheated. Ferguson and Thomas then met up with appellant who, at the time, had a nine

millimeter gun on him. The three later went to a house on Walnut N.E. where they smoked marijuana and fired a gun out of the back of a building. After their attempt to purchase marijuana at another location was unsuccessful, they went to the Sankey home in an attempt to purchase marijuana.

{¶28} Ferguson testified that appellant, after one of them knocked on the Sankey door, identified himself as "Nardo." After the shooting, Ferguson fled to Elyria but then turned himself in on July 3, 2009, after he heard that a little girl had died. At police headquarters, Ferguson gave a statement to police and picked appellant out of a photo array. Ferguson also told the police that the shooter was "Ragland." Transcript at 275.

{¶29} At the conclusion of the evidence and the end of deliberations, the jury, on December 18, 2009, found appellant guilty of all of the charges except for having weapons while under disability. The trial court found appellant guilty of such charge.

{¶30} As memorialized in a Judgment Entry filed on January 22, 2010. Appellant was sentenced to fifteen (15) years to life on the murder charge, to ten (10) years on the aggravated burglary charge and to ten (10) years on each of the four counts of aggravated robbery. Appellant also was sentenced to five (5) years on the charge of felonious assault and to five (5) years on the charge of having weapons while under disability. Appellant also was ordered to serve a three (3) year prison term for the firearm specifications. Counts One through Five were ordered to run consecutively to each other and to the firearm specification. Counts Six through Eight were ordered to run concurrently to each other and concurrently to Counts One through Five, for an aggregate prison sentence of 58 years to life.

{¶31} Appellant now raises the following assignments of error on appeal:

{¶32} "I. THE EVIDENCE AT TRIAL WAS INSUFFICIENT TO SUPPORT A CONVICTION, AND THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶33} "II. THE TRIAL COURT PLAINLY ERRED IN IMPOSING MAXIMUM PRISON TERMS FOR APPELLANT'S SEPARATE CONVICTIONS.

{¶34} "III. THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT ENTERED A JUDGMENT OF CONVICTION AND SENTENCED THE APPELLANT ON ALLIED OFFENSES OF SIMILAR IMPORT IN VIOLATION OF O.R.C. 2941.25 AND ALSO IN VIOLATION OF THE STATE AND FEDERAL PROHIBITIONS AGAINST THE IMPOSITION OF MULTIPLE PUNISHMENTS AS SET FORTH IN THE DOUBLE JEOPARDY CLAUSE, IN ADDITION TO FAILING TO SATISFY THE STATUTORY REQUIREMENTS FOR IMPOSING CONSECUTIVE SENTENCES."

I

{¶35} Appellant, in his first assignment of error, argues that his convictions for aggravated burglary, felonious assault, murder, and aggravated robbery were against the manifest weight and sufficiency of the evidence. We disagree.

{¶36} In *State v. Jenks* (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The

relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.* at paragraph two of the syllabus.

**{¶37}** On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine "whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." *State v. Thompkins,* 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N .E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1.

**{¶38}** Appellant initially argues that his conviction for aggravated burglary in violation of R.C. 2911.11(A)(1) or (A)(2) was against the manifest weight and sufficiency of the evidence because either there was no evidence, or there was legally insufficient evidence, regarding trespass.

**{¶39}** R.C. 2911.11 states, in relevant part, as follows: "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or

in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

{¶40} "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

{¶41} "(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control."

{¶42} Appellant, in support of his argument, argues that there was no evidence that either appellant or William Ferguson identified themselves as Marlo Morales' son, that Morales opened the door to them, and that there was no indication that they were ever requested to leave.

{¶43} However, although appellant may have had consent to enter Sankey's home, once he committed an act of violence against Sankey or other inhabitants of the home, the consent was revoked and appellant became a trespasser. See *State v. Cutts,* Stark App. No. 2008 CA 000079, 2009-Ohio-3563 at paragraph 181. Where a defendant commits an offense against a person in the person's private dwelling, the defendant forfeits any privilege, becomes a trespasser and can be culpable for aggravated burglary. See, e.g., *State v. Steffen* (1987), 31 Ohio St.3d 111, 115, 509 N.E.2d 383. Moreover, we note that Daniel Sankey and Denielle Sankey testified that someone identified himself as "Nardo", which is the name of Morale's son while William Ferguson testified that appellant was the one who identified himself as "Nardo." Thus, there was testimony that appellant used deception to enter the Sankey home.

{¶44} We find, therefore, that appellant's conviction for aggravated burglary is not against the manifest weight or sufficiency of the evidence.

{¶45} Appellant further argues that there "is no indication that there was any purpose involved in the discharge of the firearm necessary to support the Felonious Assault charge or the Murder conviction that followed the secondary gunshot wound to Harmoney Sankey." Appellant notes that Daniel Sankey testified that the gun "went off" after Sankey jumped up and contends that the firing was not purposeful.

{¶46} R.C. 2901.22(A) states as follows:

{¶47} "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."

{¶48} Contrary to appellant's implication that the gun accidentally went off, we note that at trial, Daniel Sankey testified that after he jumped up after appellant hit him in the head with a gun, appellant "stepped back and shot me." Transcript at 172. We find, therefore, that there was evidence that appellant purposefully shot appellant. There was evidence that appellant intended to discharge the firearm and did so.

{¶49} Finally, appellant, with respect to his convictions for aggravated robbery, argues that the evidence does not support the same because Daniel Sankey indicated that he believed the activity in the house on July 2, 2009 was a game and was not thinking that it was a robbery.

{¶50} Appellant was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1) or (A)(3). R.C. 2911.01 states, in relevant part, as follows: "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the

following:" (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;…(3) Inflict, or attempt to inflict, serious physical harm on another."

{¶51} As is stated above in the statement of facts, testimony was adduced at trial that appellant, after using deception to gain entrance to the Sankey house, approached Daniel Sankey and demanded money and drugs from him and then hit Sankey in the back of the head with a 9mm caliber handgun and shot him in the leg. As a result of shooting Sankey, appellant shot and killed Harmoney Sankey. Testimony also was adduced that appellant, while armed with a 9mm caliber gun, demanded money from Marlo Morales and took $27.00 from her and that he also unsuccessfully demanded money from Danielle Sankey and Jason Nelson.

{¶52} Based on the foregoing, we find that appellant's convictions for aggravated robbery were not against the manifest weight or sufficiency of the evidence.

{¶53} In short, we find that, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found appellant guilty of aggravated burglary, felonious assault, murder, and aggravated robbery. We further find that the jury did not lose its way in convicting appellant of such offenses.

{¶54} Appellant's first assignment of error is, therefore, overruled.

II

{¶55} Appellant, in his second assignment of error, argues that the trial court's imposition of maximum prison terms on appellant for one count of aggravated burglary with a firearm specification, four counts of aggravated robbery with firearm

specifications and one count of having weapons while under disability was "without basis or justification."[1]

{¶56} R.C. 2929.14(C) provides in pertinent part: "[T]he court imposing a sentence upon an offender for a felony may impose the longest prison term authorized for the offense pursuant to division (A) of this section only upon offenders who committed the worst forms of the offense, upon offenders who pose the greatest likelihood of committing future crimes, upon certain major drug offenders under division (D)(3) of this section, and upon certain repeat violent offenders in accordance with division (D)(2) of this section."

{¶57} R.C. 2929.14(C)'s requirement that the trial court make specific findings in support of a maximum sentence was found unconstitutional by the Ohio Supreme Court in *State v. Foster,* 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, ¶ 63-64. In *State v. Kalish,* 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, the Ohio Supreme Court reviewed its decision in *Foster* as it relates to the remaining sentencing statutes and appellate review of felony sentencing.

{¶58} In *Kalish,* the court discussed the affect of the *Foster* decision on felony sentencing. The Court stated that, in *Foster,* the Ohio Supreme Court severed the judicial fact-finding portions of R.C. 2929.14, holding that "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." *Kalish* at paragraphs 1 and 11, citing *Foster* at paragraph 100, See also, *State v. Payne,* 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306. "Thus,

---

[1] Appellant in his brief, states that he was sentenced to the maximum on all counts except the felonious assault count.

a record after *Foster* may be silent as to the judicial findings that appellate courts were originally meant to review under 2953.08(G)(2)." *Kalish* at paragraph 12. However, although *Foster* eliminated mandatory judicial fact finding, it left intact R.C. 2929.11 and 2929.12, and the trial court must still consider these statutes. *Kalish* at paragraph 13. See also *State v. Mathis,* 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1.[2]

{¶59}   "Thus, despite the fact that R.C. 2953.08(G)(2) refers to the excised judicial fact-finding portions of the sentencing scheme, an appellate court remains precluded from using an abuse-of-discretion standard of review when initially reviewing a defendant's sentence. Instead, the appellate court must ensure that the trial court has adhered to all applicable rules and statutes in imposing the sentence. As a purely legal question, this is subject to review only to determine whether it is clearly and convincingly contrary to law, the standard found in R.C. 2953.08(G)." *Kalish* at paragraph 14.

{¶60}   Therefore, *Kalish* holds that, in reviewing felony sentences and applying *Foster* to the remaining sentencing statutes, the appellate courts must use a two-step approach. "First, they must examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law. If this first prong is satisfied, the trial court's decision in imposing the term of imprisonment shall be reviewed under an

---

[2] "[P]ursuant to R.C. 2929.11(A), a trial court must be guided by the overriding purposes of felony sentencing, which are 'to protect the public from future crime by the offender and others and to punish the offender. The court must also consider the seriousness and recidivism factors under R.C. 2929.12." *State v. Murray,* Lake App. No. 2007-L-098, 2007-Ohio-6733, paragraph 18, citing R.C. 2929.11(A).

abuse of discretion standard." *Kalish* at paragraph 4, *State v. Foster,* 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.

{¶61} The sentences that appellant received, in the case sub judice, were within the permissible statutory range, and the court stated in its judgment that it had considered the principles and purposes of sentencing under R.C. 2929.11, and balanced the seriousness and recidivism factors under R.C. 2929.12. We further note that appellant does not allege that he was not properly advised of post-release control in this case. The sentences were not clearly and convincingly contrary to law.

{¶62} Furthermore, appellant has not demonstrated that the court abused its discretion in imposing the maximum sentences. The record shows that appellant had a prior criminal history. Appellant had been adjudicated a delinquent child in 2006 by virtue of having committed the offenses of felonious assault and possession of cocaine.[3] At the sentencing hearing on December 22, 2009, appellant blamed the incident on Daniel Sankey and the inhabitants of the Sankey house, stating that "if the people were so worried about Harmoney, they wouldn't be selling drugs out the house she was living in." Transcript of Sentencing hearing at 11. Appellant also blamed his convictions on "being young and black" and contended that he was guilty of being "around the wrong people." Transcript of Sentencing hearing at 11-12. The trial court, in sentencing appellant, also noted that appellant attempted to flee from the police once they came for him.

---

[3] The Magistrate's Decision that was filed in Stark County Juvenile Division Case No. CR9-30-2821, which was admitted as State's Exhibit 47, indicates that appellant was supposed to be on probation but had never had the chance to meet with his probation officer because of the new felony charges in such case.

{¶63} Based on the foregoing, we find that the trial court did not abuse its discretion in imposing the maximum sentences on appellant for aggravated burglary with a firearm specification, aggravated robbery with a firearm specification and having weapons while under disability. The trial court's decision was not arbitrary, unconscionable or unreasonable.

{¶64} Appellant's second assignment of error is, therefore, overruled.

III

{¶65} Appellant, in his third assignment of error, argues that the trial court committed plain error when it failed to merge the offenses of aggravated burglary, aggravated robbery, felonious assault and felony murder. Appellant alleged that the offenses of aggravated burglary, aggravated robbery and felonious assault were the underlying predicate offenses for the felony murder charge and that, therefore, they are allied offenses of similar import to felony murder.

{¶66} R.C. 2941.25 states as follows: "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶67} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment

or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

**{¶68}** Recently, the Ohio Supreme Court, in *State v. Johnson*, 128 Ohio St.3d 1405, 2010-Ohio-6314, - - - N.E.2d - - -, modified the test for determining whether offenses are allied offenses of similar import. In *Johnson*, the Ohio Supreme Court directed us to look at the elements of the offenses in question and determine whether or not it is possible to commit one offense and commit the other with the same conduct. If the answer to such question is in the affirmative, the court must then determine whether or not the offenses were committed by the same conduct. If the answer to the above two questions is yes, then the offenses are allied offenses of similar import and will be merged. If, however, the court determines that commission of one offense will never result in the commission of the other, or if there is a separate animus for each offense, then the offenses will not merge according to *Johnson*, supra.

**{¶69}** In the case sub judice, appellant was convicted of felony murder in violation of R.C. 2903.02(B). R.C. 2903.02(B) states as follows: "(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." The indictment in the case sub judice lists the offenses of violence as aggravated burglary in violation of R.C. 2911.11(A)(1) or (A)(2), aggravated robbery in violation or R.C. 2911.01(A)(1) or (A)(3) and felonious assault in violation of R.C. 2903.11(A)(1) or (A)(2).

**{¶70}** In addition, appellant was separately indicted on aggravated burglary, aggravated robbery (4 counts) and felonious assault. And, he was convicted of each of those.

**{¶71}** The prosecution can elect any of the above three felonies as charged as the predicate offense.[4] Appellant was convicted of Count Three, which was aggravated robbery with Daniel Sankey as the victim. The evidence at trial demonstrated that after Daniel Sankey did not comply with appellant's demands appellant hit him in the head with a gun and then shot him in the leg. As a result of shooting Daniel Sankey, appellant shot and killed Harmoney Sankey. Thus, there were separate victims with respect to the aggravated robbery and the felony murder. While Daniel Sankey was the victim of the aggravated robbery, Harmoney Sankey was the victim with respect to the felony murder. Because there were two separate victims, appellant's conduct constituted two offenses of dissimilar import. See *State v. Maddern*, Stark App. No. 1999CA00273, 2000 WL 700307, citing to *State v. Jones* (1985), 18 Ohio St.3d 116, 480 N.E.2d 408. In *Jones*, two passengers in the defendant's automobile were killed as a result of defendant's reckless operation of his vehicle. The Supreme Court found the defendant's conduct constituted two offensives of dissimilar import. The "import" being each person killed. Therefore, the Supreme Court concluded, the defendant was lawfully convicted and sentenced on both counts.

---

[4] See *State v. Kinney,* (Aug.21, 1998), Lake App. No. 97-L-034, 1998 WL 637515. The appellant, in such case, was convicted of burglary in violation of R.C. 2911.12. Such statute prohibits the entry of an occupied structure by force, stealth or deception. On appeal, he argued that the evidence was insufficient because no force was shown. The Court of Appeals said that the state could prove the charge with evidence as to any of the three concepts and that the appellant had not asked the Court to order the state to elect a theory upon which to proceed at trial

{¶72} Based on the foregoing, we find that the predicate offense of aggravated robbery was not an allied offense in relation to felony murder. Because aggravated burglary and felonious assault were not the predicate offenses to felony murder, in the case sub judice they are not subject to merger with the felony murder charge.

{¶73} As is stated above, appellant was convicted of four counts of aggravated robbery in violation of R.C. 2911.01(A)(1) or (A)(3). We find that such offenses are not allied offenses of similar import because they were not committed by the same conduct. All of the aggravated robbery counts involved different victims and different conduct. Testimony was adduced at trial that appellant initially approached Daniel Sankey and made demands and that he later separately approached Marlo Morales, Danielle Sankey and Jason Nelson demanding money. Thus, the four counts of aggravated robbery are not allied offenses of similar import because each was committed with a separate animus.

{¶74} The next issue for determination is whether or not the offenses of aggravated burglary and felonious assault are allied offenses of similar import. Appellant was convicted of aggravated burglary in violation of R.C. 2911.11(A)(1) or (A)(2). Such section states as follows: "A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

**{¶75}** "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

**{¶76}** "(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control."

**{¶77}** Appellant also was convicted of felonious assault in violation of R.C. 2903.11(A)(1) or (A)(2). Such section states as follows: "A) No person shall knowingly do either of the following:

**{¶78}** "(1) Cause serious physical harm to another or to another's unborn;

**{¶79}** "(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

**{¶80}** We find that the aggravated burglary and felonious assault offenses are not allied offenses of similar import because the offenses were committed separately with a separate animus. The aggravated burglary was committed when appellant, under the guise of being "Nardo", used deception to gain entrance to appellant's home with the intent to commit a robbery and while having a deadly weapon under his control. The felonious assault did not occur until later when appellant hit Daniel Sankey in the head after demanding money and drugs and then shot Daniel Sankey in the leg. The aggravated burglary, therefore, was complete before the felonious assault took place. The two, therefore, involved separate conduct and a separate animus and are not allied offenses of similar import.

**{¶81}** We further find that aggravated robbery and felonious assault are not allied offenses of similar import. Appellant committed the felonious assault when he knowingly caused serious physical harm to Daniel and/or Harmoney Sankey or when he

caused or attempted to cause physical harm to either of them by means of a firearm. He committed the offense of aggravated robbery when he approached his victims and demanded money while displaying his handgun. We find that the offenses were committed with a separate animus.

{¶82} Finally, the question that must be addressed is whether or not aggravated burglary and aggravated robbery are allied offenses of similar import. Appellant was convicted of aggravated burglary in violation of R.C. 2911.01(A)(1) or (A)(2). R.C. 2911.11(A) states, in relevant part, as follows: "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

{¶83} "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

{¶84} "(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control."

{¶85} In order to commit the offense of aggravated burglary, one does not have to actually commit any criminal offense. Rather, one has to trespass with purpose to commit a criminal offense. Thus, appellant committed aggravated burglary when he used deception to gain entry into appellant's home with the purpose to commit a criminal offense therein while having a deadly weapon under his control.

{¶86} In contrast, R.C. 2911.01, the aggravated robbery statute, states as follows: "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

{¶87} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;…

{¶88} "(3) Inflict, or attempt to inflict, serious physical harm on another."

{¶89} In the case sub judice, appellant committed the aggravated robberies when he approached the four separate victims individually and demanded money and/or drugs. The aggravated burglary and the aggravated robbery involved separate conduct.

{¶90} Based on the foregoing, we find that aggravated burglary and aggravated robbery are not allied offenses of similar import.

{¶91} In short, we find that the trial court did not err in sentencing appellant because the offenses were not allied offenses of similar import.

{¶92} Appellant's third assignment of error is, therefore, overruled.

{¶93} Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed.

By: Edwards, P.J.

Hoffman, J. and

Delaney, J. concur

_____

_____

_____

JUDGES

JAE/d1013

[Cite as *State v. Ragland*, **2011-Ohio-2245.**]

IN THE COURT OF APPEALS FOR STARK COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | |
| | : | |
| | : | |
| -vs- | : | JUDGMENT ENTRY |
| | : | |
| MAKI RAGLAND | : | |
| | : | |
| Defendant-Appellant | : | CASE NO. 2010CA00023 |

For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellant.

_____

_____

_____

JUDGES